DIRECTOR OF THE CIVIL DEFENSE AGENCY AND OFFICE OF
EMERGENCY PREPAREDNESS *vs.* CAMILLE A. LEGER
& another[1]
(and a companion case[2]).

Suffolk. January 21, 1980. — May 16, 1980.

Present: BROWN, GREANEY, & DREBEN, JJ.

*Civil Defense Agency. Civil Service. Statute, Construction.*

The seniority rights of a civil service employee of the Civil Defense Agency and Office of Emergency Preparedness were not extinguished by a staffing schedule abolishing the position held by the employee which was sent by the Chairman of the Senate and House Committees on Ways and Means to the division of personnel administration under the purported authorization of St. 1975, c. 684, a general appropriation act, where the statute merely authorized a major reduction in the agency's personnel, made no reference whatsoever to the schedule, and specifically made the agency's expenditures contingent on Federal approval which in turn was dependent on a personnel merit system being in effect. [738-743]

CIVIL ACTIONS commenced in the Superior Court on May 6, 1976, and May 3, 1977.

Motions for partial summary judgment were heard by *Lynch*, J., and final judgments were entered by *Dimond*, J.

*Jeffrey M. Graeber* (*Walter H. Mayo, III*, with him) for the plaintiff.

*Scott A. Lathrop* (*Betty E. Waxman*, Assistant Attorney General, with him) for Camille A. Leger & another.

DREBEN, J. The Civil Service Commission (Commission) on July 9, 1975, and again on March 31, 1977, found that

———

[1] Civil Service Commission.

[2] The companion case is between the same parties.

two purported terminations of the employment of Camille Leger, a veteran, by the Civil Defense Agency and Office of Emergency Preparedness (Agency) were invalid and ordered Leger reinstated to his position as sector director. In the first decision, the Commission ruled that the Agency had violated the hearing provisions of G. L. c. 31, § 43 (a), as amended through St. 1970, c. 72,[3] because the deputy director of the Agency, rather than the director, had conducted the first termination hearing. The second decision held that the second purported termination was invalid because the Agency had violated the seniority rights of Leger. See G. L. c. 30, § 9A, as appearing in St. 1947 c. 242, and G. L. c. 31, § 46G, as amended through St. 1967, c. 96. The director brought separate actions seeking judicial review of each of the Commission's decisions. Leger filed counterclaims for damages and the two actions were consolidated. After partial summary judgments were entered for Leger on the issue of liability pursuant to the recommendation of a special master, the parties stipulated as to the amount of damages, and judgments were entered awarding Leger the stipulated amount. The judgments also declared the rights of the parties.

The director appeals from those judgments and argues that the deputy director had authority to conduct the first hearing and that Leger's seniority rights were extinguished by the 1975 general appropriation act, St. 1975, c. 684. We find nothing in that statute which extinguishes Leger's seniority rights and hold that the director has not shown a basis for either of Leger's discharges. We, therefore, find it unnecessary to discuss the question of the deputy director's authority to conduct a termination hearing. The judgments are affirmed in so far as they awarded damages to Leger and declare that the purported terminations were invalid for failure of the Agency to comply with the applicable seniority provisions of the civil service laws.

We summarize briefly the relevant facts, drawing on undisputed testimony and exhibits before the Commission as

---

[3] The 1978 revision of G. L. c. 31, effected by St. 1978, c. 393, § 11, substantially changed the section numbering of that chapter.

well as on its findings.  In January, 1975, the Agency was directed by the Secretary of Public Safety to cut eighty percent of its personnel for budgetary reasons.  A compromise plan for a lesser reduction was reached whereby the Agency was to retain forty-three employees, including eight sector directors.[4] Eight other sector directors were to be terminated effective March 28, 1975.  Although Leger had greater seniority[5] than another employee who was retained, he was one of the sector directors laid off.  The compromise plan was approved by the Commissioner of Administration as evidenced by a statement, marked effective March 28, 1975, received by the Agency from the Commissioner.  That statement eliminated sector directors, including Leger, by position number.

On November 8, 1975, St. 1975, c. 684, the general appropriation act, was approved.  Section 2 of that act[6] provided for an appropriation for not more than fifty-two positions in the Agency, contingent on Federal approval and funding.  A letter dated November 8, 1975, under the joint signatures of the chairmen of the Senate and House Committees on Ways and Means was sent to the division of personnel administration.  The text of that letter reads: "Attached please find schedules of changes in staffing as authorized by Chapter 684 of the Acts of 1975."  The schedule[7] which pertained to the

---

[4] Pursuant to Executive Orders No. 26 (1955) and No. 34 (1958) of the Governor, the Commonwealth had been geographically divided for purposes of the Agency into areas and sectors.

[5] As determined by the Commission in the second decision based on a seniority list prepared by the Agency.

[6] Section 2 of St. 1975, c. 684, item 0432-0001, provides: "For the service of the civil defense agency; provided, that expenditures from this item shall be contingent upon the prior approval of the proper federal authorities and shall be expended with at least an equivalent amount of federal funds for the purposes of this item, including not more than fifty-two permanent positions $305,361."

The prior year's budgetary provision, St. 1974, c. 431, § 2, item 0432-0001, was in the same form but provided $544,820 for not more than one hundred one permanent positions.

[7] The schedule was entitled "Permanent Position Quota Adjustments Chapter 684, Acts of 1975 Effective November 8, 1975."

Agency showed a net loss of forty-nine positions, and listed the decrease in sector directors in the same manner by position number as had the statement of the Commissioner of Administration.

In June, 1976, the director reinstated Leger for one day. After a hearing, he again terminated Leger, citing as his reasons both a lack of funds and the fact that the position had been "expressly abolished by the Legislature by virtue of Chapter 684 of the Acts of 1975."

The issue before us is not whether the Legislature could abolish Leger's position, a position held to be protected by civil service in *Director of the Civil Defense Agency* v. *Civil Service Commn.*, 373 Mass. 401, 404 (1977). It is settled law that civil service and other tenure statutes "must yield" to "general legislative action." *Simonian* v. *Boston Redevelopment Authy.*, 342 Mass. 573, 581 (1961). *Reynolds* v. *McDermott*, 264 Mass. 158, 165 (1928). *McNeil* v. *Mayor of Peabody*, 297 Mass. 499, 503-504 (1937). *Bessette* v. *Commissioner of Pub. Works*, 348 Mass. 605, 610 (1965). *Letteney* v. *Commissioner of Commerce & Dev.*, 358 Mass. 10, 12-13 (1970). We also have no doubt that an "adequate expression of the intention" of the legislative body may be found in budgetary acts. *Openshaw* v. *Fall River*, 287 Mass. 426, 431 (1934). *Sullivan* v. *Worcester*, 346 Mass. 570, 574 (1963). *McDonough* v. *Commissioner of Pub. Works*, *post* 909 (1980). But see *Fortin* v. *Chicopee*, 301 Mass. 447, 449 (1938) ("budgetary action . . . might possibly be deemed legislative action"). The issue facing us is whether the schedule sent to the personnel administrator by the chairmen of the Senate and House committees on ways and means is a legislative determination that Leger's seniority rights "must yield".

A similar problem arose in *Murphy* v. *Administrator of the Div. of Personnel Admn.*, 377 Mass. 217 (1979), where the plaintiffs argued that class reallocations shown on schedules of the Joint Committee on Ways and Means were "fixed by law." The Supreme Judicial Court, approving the analysis of this court in *Gavin* v. *Commonwealth*, 2 Mass.

App. Ct. 833 (1974), rejected that argument and held that the appropriation acts did not intend to change the plaintiffs' job group. Noting that the budgetary items of those acts made "no reference whatsoever to the Joint Committee's reallocations", *id.* at 224, the court dismissed the argument that by incorporating the schedules by reference, § 7 of St. 1973, c. 466, a provision almost identical in so far as relevant, to § 7 of St. 1975, c. 684,[8] created an alternate procedure to G. L. c. 30, § 45, and empowered the Joint Committee to reallocate personnel classifications. The court pointed out, as had the court in *Gavin*, that the General Court in other legislation expressly reallocated identified positions, and referring thereto concluded, "[W]e think it clear that, had the General Court intended to reallocate the plaintiff's positions in the instant case, it would have done so with the same clarity and specificity." *Murphy*, 377 Mass. at 225.

The arguments of the Agency based on legislative intent in the appropriation act involved here have less force than those rejected in *Murphy* and in *Gavin*. Item 0432-0001 of § 2 of the 1975 act, quoted in note 6, *supra*, does authorize a major reduction in personnel.[9] However, not only does it make "no

---

[8] A portion of § 7 of St. 1975, c. 684, is quoted below. The italicized words do not appear in the 1973 act, and the words in parentheses do not appear in the 1975 act. Otherwise, the two sections are the same. "Amounts included for permanent positions in sums appropriated in section two for personal services are based upon schedules of permanent positions and salary rates as approved by the *house and senate committees* [joint committee] on ways and means, and, except as otherwise shown by the files of said *committees* [committee], a copy of which shall be deposited with the bureau of personnel, no part of sums so appropriated in section two shall be available for payment of salaries of any additional permanent position, or for payments on account of reallocations or permanent positions, or for payments on account of any change of salary range or compensation of any permanent position, notwithstanding any special or general *law* [act] to the contrary . . . ."
The language referring to approval of the House and Senate committees was changed in the next year. St. 1976, c. 283, § 7. See *Opinion of the Justices*, 369 Mass. 990 (1976).

[9] The maximum reduction would be forty-nine people, since the 1974 authorization was for one hundred one positions and the 1975 authoriza-

reference whatsoever" to the schedules of the House and Senate Committees on Ways and Means, but it specifically makes the expenditures contingent on Federal approval and funding. Federal law requires that positions in the civil defense organization be "on a personnel merit basis." *Director of the Civil Defense Agency* v. *Civil Service Commn.*, 373 Mass. at 405 & n.7. Indeed, the "vital importance of Federal funding", *id.* at 408, and its dependence "on a merit system being in effect," *id.* at 410, were crucial factors in the court's holding that Agency employees were under civil service. *Id.* at 405-408, 410. The conditioning of expenditures on the receipt of Federal funding severely undercuts the director's argument that Leger's seniority rights were intentionally extinguished by the budgetary item. We also note that his contention that § 7, see note 8, *supra*, by referring to schedules approved by the House and Senate committees, authorizes job abolition by committee schedule, has less validity than the parallel contention made in *Murphy*. The schedule involved here abolishes positions and, hence, may not even be one of the schedules of permanent positions referred to in § 7.

Finally, we note that the Legislature is extremely sensitive to the civil service laws where jobs are eliminated. Thus in numerous cases involving abolition of positions, the statutes construed indicate that the General Court referred to the civil service laws with "clarity and specificity." See *Murphy*, 377 Mass. at 225. E.g., St. 1956, c. 465, § 22, considered in *McGrath* v. *Massachusetts Port Authy.*, 350 Mass. 762, 763 (1966); St. 1963, c. 821, § 6, considered in *Bessette* v. *Commissioner of Pub. Works*, 348 Mass. 605, 607 (1965); St. 1964, c. 636, § 16, in *Letteney* v. *Commissioner of Commerce & Dev.*, 358 Mass. 10, 11 (1970); St. 1968, c. 761, § 14, in *Power* v. *Secretary of the Dept. of Community Affairs*, 7 Mass. App. Ct. 409, 414 (1979); and

tion was for fifty-two positions. See note 6, *supra*. See *Director of the Civil Defense Agency*, 373 Mass. at 402, indicating that thirty positions were involved in that litigation.

St. 1974, c. 839, §§ 2 and 4, in *O'Connor* v. *City Manager of Medford*, 7 Mass. App. Ct. 615, 620 (1979).

We conclude, relying on *Murphy* and *Gavin*, on the requirements of Federal funding and on the Legislature's sensitivity to civil service, that there is no force in the director's contention that Leger's seniority rights were legislatively extinguished. We consider this conclusion consistent with the discussion in *Director of Civil Defense Agency*, 373 Mass. at 411-412, where the director put forward similar arguments.

Accordingly, the portions of the judgments which award damages to Leger and which declare that the purported terminations of his employment violated the seniority provisions of the civil service laws are to stand. Those portions of the judgments which declare the rights of the parties on issues not dealt with in this opinion are to be struck. As so modified, the judgments are affirmed.

*So ordered.*